UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| BRIAN LUNDSTROM, | Case No.: 18cv2856-GPC (MSB) |
|---|---|
| Plaintiff, | |
| v. | **DISCOVERY ORDER** |
| | **[ECF. NO. 202]** |
| CARLA YOUNG, et al., | |
| Defendants. | |

Pending before the Court is a Joint Discovery Motion, filed by Plaintiff Brian Lundstrom ("Plaintiff"), and Defendants Ligand Pharmaceuticals Incorporated ("Ligand") and Ligand Pharmaceuticals, Inc. 401(k) Plan (the "401(k) Plan") (collectively "Defendants") ("the Parties"), which asks this Court to determine whether certain communications between Ligand employees and outside counsel are protected from discovery by Plaintiff based on the attorney-client privilege. (ECF No. 202.) Specifically, Plaintiff seeks to compel Ligand's Chief People Officer, Audrey Warfield-Graham; Ligand's person most knowledgeable ("PMK"), Matt Korenberg; and Ligand's General Counsel, Charles Berkman, to answer questions regarding Berkman and Warfield-Graham's communications with outside counsel at Latham & Watkins LLP ("Latham & Watkins") related to the Qualified Domestic Relations Order ("QDRO"), whose execution plays heavily in this case. (Id. at 18.)  Defendants oppose, invoking the attorney-client

privilege and request a full briefing schedule and an in-person hearing. (Id. at 23.)

After carefully reviewing the Parties' Joint Discovery Motion, supporting exhibits, and the authorities cited therein, the Court finds this motion suitable for ruling on the pleadings presently before the Court. The Court finds that Ligand's communications with outside counsel at Latham & Watkins were directed to Defendants' desire to avoid civil liability in the face of competing demands from Plaintiff, Plaintiff's ex-wife Carla Young, and the court that issued the QDRO, and they are therefore protected by the attorney-client privilege from discovery by Plaintiff.

## I.   FACTUAL BACKGROUND[1]

Plaintiff's contentious divorce, finalized in Texas on July 30, 2014, and subsequent child support proceedings provide the backdrop for the issues in this dispute. (ECF No. 202; ECF No. 92 at 5.) Plaintiff began working for Ligand approximately a year and a half after his divorce and started participating in the Ligand 401(k) Plan on or about April 1, 2016. (ECF No. 92 at 5-6.) In July of 2017, Plaintiff's ex-wife, Carla Young, subpoenaed Ligand to produce documents related to Plaintiff's assets and income, including his Ligand 401(k) Plan. (ECF No. 202-2; ECF No. 202-11 at 2-3.) At Plaintiff's request, Ligand objected, and on August 2, 2017, Young sued Ligand in San Diego Superior Court to enforce the subpoena. (ECF No. 202 at 15; ECF No. 202-3.)

Ligand also received court orders to withhold child support payments from Plaintiff's paychecks. (ECF No. 202 at 15.) Plaintiff requested that Ligand ignore or cease compliance with the orders on multiple occasions. (Id.; ECF No. 202-11 at 3.) In an email exchange with Ligand's Payroll and Accounts Payable Supervisor Debbie Schneider in October of 2017, Plaintiff directed Schneider to stop the child support withholdings once a certain amount had been paid. (ECF No. 202-4 at 3.) Schneider

---

[1] The Parties' Joint Discovery Motion includes a "Joint Factual Background" section that evidently includes the Parties' agreed-upon facts. (ECF No. 202 at 15-17.) For efficiency's sake, the Court will cite to this shared factual summary where the Parties did not include exhibits directly supporting a specific assertion.

replied, "[y]ou don't understand that we are [liable] if we break the law and don't withhold until we get a release." (Id.)

Ligand's General Counsel, Charles Berkman, sought advice from Ligand's longstanding outside counsel John (Jake) Ryan, a litigation and trial partner at Latham & Watkins, related to Ligand's potential liability in the face of Plaintiff's numerous demands and threats about what Ligand should do in response to the subpoenas and child support orders. (ECF 202-10 at 2-3; ECF No. 202-11 at 3.) Ryan has served as Ligand's litigation counsel since 2007 and communicates with Berkman when "Ligand requires assistance with anticipated or ongoing litigation matters." (ECF No. 202-11 at 2.) Specifically, Ryan represented Ligand in the 2017 subpoena litigation with Young and spoke multiple times with Berkman regarding the subpoenas and Texas child support orders. (Id. at 3.)

On December 14, 2017, Young's attorney served Ligand with a QDRO issued by a Texas court on November 21, 2017. (ECF No. 202-5; ECF No. 202-11 at 3.) Ligand notified Plaintiff of the QDRO and provided him a copy by January 4, 2018. (ECF No. 202 at 15.) Plaintiff emailed Warfield-Graham (chief people officer), Berkman, and Ligand President Matt Foehr on January 5, 2018, outlining five matters related to the QDRO he wanted Ligand to discuss with Fidelity's QDRO or legal department: 1) QDROs were supposed to be for marital assets, not post-marital assets, 2) the QDRO did not provide "exact dates" of when the 401(k) was earned, 3) the QDRO was silent as to whether it was issued for child support, alimony or marital property purposes, 4) that 401(k)s might be immune from transfer for employees of a certain age, and 5) the QDRO might not have resulted from a "real court hearing." (ECF No. 202-6 at 3.) Plaintiff suggested that Ligand acknowledge receipt of the QDRO but refrain from complying until Ligand performed some "necessary research," and discussed next steps with Plaintiff. (Id.)

Foehr responded to Plaintiff the same day, reiterating via email what he had earlier expressed to Plaintiff in a phone call: "from a legal and corporate perspective, this appears to be a legitimate court order—so Ligand has to follow it." (Id.) Plaintiff

replied that he planned to consult with a "nationwide QDRO expert" and asked Ligand to do nothing "until [he had] a solid answer back." (Id.) Berkman replied that Plaintiff's areas of concern were not "likely to change how [he viewed the QDRO] unless [Plaintiff found] a way to challenge the court order and get it set aside, reversed, quashed, etc." (Id. at 2.) Later that afternoon, Plaintiff confirmed he had spoken to his "QDRO expert" and learned that it was common for plan administrators to take sixty days to respond. (Id.)

On January 8, 2018, Plaintiff forwarded an email from his "QDRO expert," attorney Tony Jarrett, to Ligand and claimed the expert had identified major problems with the QDRO's legality. (ECF No. 202-7 at 3-4.) Plaintiff indicated he planned to follow the advice of Ligand and Jarrett and hire a lawyer to quash the QDRO. (Id. at 3.)

On January 18, 2018, Warfield-Graham emailed Plaintiff stating outside legal counsel had "confirmed the QDRO satisfies all legal requirements" and Ligand would comply with the QDRO on February 1, 2018, unless Plaintiff obtained a stay of the QDRO. (ECF No. 202-7 at 2-3.) Again, Plaintiff responded with several demands of Ligand, including, "at a minimum, the company needs to make sure the 401(k) is only released against proper offset in child support arrearage payoff with the disbursement unit," and "Ligand must avoid double- and triple-dipping." (Id. at 2.) Plaintiff unsuccessfully appealed the QDRO to the Texas state court on January 26, 2018. (ECF No. 202 at 16.) The appellate court denied Plaintiff's subsequent writ of mandamus on February 5, 2018, at which point Ligand informed Plaintiff that it would begin the distribution process to comply with the QDRO. (Id.) After the Texas Supreme Court rejected the last of Plaintiff's challenges to the QDRO on November 16, 2018, Plaintiff filed suit against Ligand on December 20, 2018. (Id.; ECF No. 1.)

///
///
///
///

## II.     RELEVANT PROCEDURAL HISTORY

During years of litigation on the pleadings, the District Court dismissed Plaintiff's claims that either challenged the validity of the QDRO or relied on arguments concerning the QDRO's validity under the Rooker-Feldman and collateral estoppel doctrines.  (ECF No. 64 at 14-15; ECF No. 120 at 16, 21.)  Young is no longer a defendant and only three causes of action remain against Ligand and the 401(k) Plan: (1) Ligand distributed the benefits in Plaintiff's 401(k) account in violation of the 401(k) Plan's terms, (ECF No. 120 at 27); (2) Ligand violated section 1056(d)(3)(G)(i) of ERISA by failing to promptly provide Plaintiff a copy of the 401(k) Plan's procedures for determining the qualified status of a Domestic Relations Order, by not having a written policy in place outlining those procedures, and failing to send Plaintiff a written notification that the QDRO had satisfied the requirements under the 401(k) Plan and the Internal Revenue Code, (ECF No. 120 at 30); and (3) Ligand violated ERISA's anti-retaliation provision in section 510 by terminating Plaintiff in retaliation for exercising his rights under ERISA, (ECF No. 120 at 33).

After holding an Early Neutral Evaluation and Case Management Conference, the Court issued a Scheduling Order on December 20, 2022.  (ECF No. 136.)  Under this order, fact discovery closed on July 21, 2023.  (Id. at 2.)  The Court granted Plaintiff's unopposed motions to extend the deadline for certain depositions, so long as those of Korenberg and Warfield-Graham were completed by August 31, 2023, and Berkman's deposition was taken by September 21, 2023.  (ECF Nos. 184, 191.)  Plaintiff took Warfield-Graham's deposition on July 31, 2023.  (ECF No. 202-1.)  Plaintiff now seeks to compel Warfield-Graham, Korenberg, and Berkman, to answer questions Ligand's counsel instructed them not to answer based on a claim of attorney-client privilege during previous depositions.  (ECF No. 202 at 18.)  Specifically, Plaintiff seeks to compel testimony directly related to email communications between Warfield-Graham and Latham & Watkins attorneys Holly Bauer, Jake Ryan, Sandhya Chandrasekhar, and Joanne Romanelli, with subject matters "Lundstrom QDRO," "Questions on QDRO

requirements," and "Consulting expert on QDRO requirements," between January 10, 2018, and January 27, 2018. (ECF No. 202 at 18; ECF No. 202-9.) Ligand maintains these emails are protected by the attorney-client privilege.[2] (ECF No. 202 at 23.)

### III.  DISCUSSION

Plaintiff claims that the email communications at-issue relate to Ligand's administration of his 401(k) plan with respect to the QDRO before a final determination of the QDRO's validity had been made, so he is entitled to their disclosure under the fiduciary exception to attorney-client privilege. (ECF No. 202 at 19.) Additionally, Plaintiff claims that because a final determination had not yet been made about the QDRO's validity, he—not his ex-wife—was the true beneficiary of the Plan's 401(k) at the time of the communications, so he is entitled to their disclosure. (Id. at 22.) Lastly, Plaintiff claims that because he had not threatened Ligand with "imminent litigation" at the time the communications took place Ligand cannot assert attorney-client privilege over the contents. (Id. at 20.)

Defendant Ligand argues that the communications were made with outside counsel for Ligand's own benefit after Ligand recognized that if it "ignored the QDRO, it would imminently face a second litigation from Young," but "[i]f it complied, it would imminently face litigation from Plaintiff (who sued a month after the Texas courts rejected his QDRO appeal)." (Id. at 24.) As such, the advice was given in anticipation of litigation and was note related to plan administration, so the communications are protected by the attorney-client privilege and not subject to the fiduciary exception. (Id.) Ligand further claims it had already determined the QDRO was valid on January 5, 2018, before the communications at-issue took place. (ECF No. 202 at 25.)

---

[2] Though Defendants' position statement asserts that Plaintiff seeks communications protected by both attorney-client privilege and work product doctrine, all of Defendants' briefing is targeted to the attorney-client privilege and the fiduciary exception thereto. (See ECF No. 202 at 23-27.) For this reason, and because the Court finds the communications at-issue are protected by the attorney-client privilege, the Court does not address work product protections.

Consequently, Ligand maintains Young became the Plan's true beneficiary at that point and Plaintiff lacks any right to invoke the fiduciary exception. (ECF No. 202 at 27.)

### A. Legal Standard

Attorney-client privilege protects "confidential disclosures by a client to an attorney made in order to obtain legal assistance." Fisher v. United States, 425 U.S. 391, 403 (1976). The privilege recognizes that a client's freedom to communicate openly and honestly with an attorney without fear of disclosure enables a fully informed attorney to provide sound legal advice to the client. Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). Preserving the privilege is "essential to the just and orderly operation of our legal system." United States v. Bauer, 132 F.3d 504, 510 (9th Cir. 1997). "A party asserting the attorney-client privilege has the burden of establishing the relationship and the privileged nature of the communication." United States v. Ruehle, 583 F.3d 600, 607 (9th Cir. 2009) (quoting Bauer, 132 F.3d at 507).

Relevant here, the Ninth Circuit is one of several that recognizes a fiduciary exception to the attorney-client privilege in certain situations. United States v. Mett, 178 F.3d 1058, 1062-1063 (9th Cir. 1999). Specifically, in the context of ERISA, an employer acting as an ERISA fiduciary may not assert attorney-client privilege against a plan's beneficiaries on matters of plan administration. Id. at 1063 (citing Becher v. Long Is. Lighting Co., 129 F.3d 268, 272 (2d Cir. 1997)). Two alternative rationales are often invoked for the fiduciary exception to attorney-client privilege. Id. Some courts have held because ERISA trustees have a duty to disclose all the information regarding plan administration to their beneficiaries, the fiduciary exception acts as a competing legal principle to attorney-client privilege. Id. (citing Becher, 129 F.3d at 271-72). Other courts have reasoned that because the advice on plan administration is sought by the trustee on behalf of the plan's beneficiary, the beneficiary is the client for purposes of these communications and holder of the privilege. Id. (citing United States v. Evans, 796 F.2d 264, 265-66 (9th Cir. 1986)). By this reasoning, the "fiduciary exception" is better conceived as an application of attorney-client privilege, rather than an exception to it.

*Id.* Regardless of which basis is adopted, the fiduciary "exception" only applies when the fiduciary seeks the advice for the benefit of the beneficiary, not when it seeks advice to protect or defend the fiduciary. *Id.* at 1063-64.

To determine whether communications between a fiduciary and counsel are protected from disclosure to the beneficiary, courts "focus on the 'intended recipient of the advice and the purpose for which it is sought,'" rather than on a distinction between fiduciary and non-fiduciary activities. *Ely v. Bd. of Trustees of PACE Indus. Union-Mgmt. Pension Fund*, 334 F.R.D. 289, 294–95 (D. Idaho 2020) (quoting *Fischel v. Equitable Life Assurance*, 191 F.R.D. 606, 609 (N.D. Cal. 2000)) ("[C]ourts should . . . focus on whether the advice was sought for the benefit of the beneficiaries, as opposed to whether the advice is sought for the trustee's own protection."). One court construed the *Mett* rule as "excluding from [the fiduciary exception] any advice whose goal is to advise the trustee about the legal implications of actions and decisions undertaken while performing its fiduciary obligations." *Fischel*, 191 F.R.D. at 609. This approach is preferred because: (1) it is sufficiently narrow to recognize that a fiduciary has a right to consult with counsel for its own protection, (2) when a fiduciary does so, the rational that the fiduciary is acting as the agent of the beneficiary no longer applies, (3) it protects the attorney-client privilege in close cases, and (4) it encourages fiduciaries to seek advice regarding the performance of their duties so that they are better informed and more readily willing to serve as fiduciaries. *Mett*, 178 F.3d at 1065. On the other hand, "the use of a fiduciary-nonfiduciary activity distinction as the touchstone for a privilege inquiry . . . is awkward at best, simply because the existence of a fiduciary duty may be an ultimate issue that simply cannot be resolved in the course of discovery disputes." *Fischel*, 191 F.R.D. at 609 (quoting Craig C. Martin & Matthew H. Metcalf, *The Fiduciary Exception to the Attorney-Client Privilege*, 34 Tort & Ins. L.J. 827 (1999)).

Finally, regarding the attorney-client privilege, "hard cases should be resolved in favor of the privilege, not in favor of disclosure." *Mett*, 178 F.3d at 1065. This is because "[a]n uncertain privilege, or one which purports to be certain but results in

widely varying applications by the courts, is little better than no privilege at all." Id. (quoting Upjohn, 449 U.S. at 393).

**B.    Analysis**

Because Ligand seeks to assert attorney-client privilege, it bears the burden of establishing the relationship and the privileged nature of the communications at-issue. Ligand has satisfied this burden by demonstrating that its communications with counsel at Latham & Watkins in January of 2018 were to seek advice about Ligand's exposure to liability in the face of competing demands regarding the QDRO.  In their sworn declarations, John Ryan and Charles Berkman state that Ligand sought legal advice from outside litigation counsel regarding the litigation it expected from Plaintiff or Young, "depending on how the Ligand Defendants proceeded after receiving the QDRO." (ECF No. 202-10 at 3; ECF No. 202-11 at 3.)  Additionally, both Berkman and Ryan declare they do not intend to reveal the substance of those communications or waive any privilege or protection.  (ECF No. 202-10 at 2; ECF No. 202-11 at 2.)  Furthermore, Plaintiff does not contest that the communications at-issue are protected by attorney-client privilege, only whether the fiduciary exception renders them disclosable by Plaintiff.  (ECF No. 202 at 18-22.)

The critical question in determining whether the fiduciary exception applies is whether the legal advice was sought for the benefit of a plan beneficiary or for Ligand. Defendants have shown that Ligand's communications with counsel at Latham & Watkins regarding the QDRO were for the purpose of understanding Ligand's potential liabilities with respect to the various actions it might take.  Both Ryan and Berkman declare that Ligand has sought advice from Latham & Watkins and Ryan since 2007 in multiple litigation-related matters. (ECF No. 202-10 at 2; ECF No. 202-11 at 2.)  Ryan further declares that he communicates frequently with Berkman by telephone and email when "Ligand requires assistance with anticipated or ongoing litigation matters." (ECF No. 202-11 at 2, emphasis added.)  Both declarations further state that beginning April 2017, Ligand sought advice from Latham & Watkins in relation to Plaintiff's

multiple requests that Ligand ignore court orders and subpoenas, his invocation of outside counsel, and threats of litigation.  (ECF No. 202-11; ECF No. 202-10.) Importantly, Ryan explains that Berkman does <u>not</u> seek "advice on 401(k) plan administration issues," nor would he expect Berkman to do so because Ryan has "no expertise on 401(K) plan administrative matters."  (ECF No. 202-11 at 2.)

These declarations are consistent with the circumstances at the time of the communications.  On January 5, 2018, after being notified of the QDRO, Plaintiff emailed Ligand with a list of problems he identified with the QDRO, telling Ligand what he believed it should do going forward—including communications it should have with Young's counsel and Fidelity, issues it should research, and how it ought to consult with Plaintiff before taking further action.  (ECF No. 202-6 at 3-4.)  Ligand's President and General Counsel replied to Plaintiff that the QDRO appeared to be valid, and Ligand would need to comply.  (ECF No. 202-6 at 2-3.)  Plaintiff responded, urging Ligand not to comply with the QDRO until he could consult an expert, later adding that it was common for plan administrators to take sixty days to respond to a QDRO order.  (ECF No. 202-6 at 2.)  Thus, at the outset, Ligand was subject to competing demands—from the Court that had issued the order, and from two competing beneficiaries seeking completely opposite outcomes.

Ligand had reason to believe it was not permitted to follow Plaintiff's directives on the basis of his assertions about the legality of the QDRO.  ERISA has established a checklist procedure for plan administrators to follow when qualifying a QDRO.  <u>See</u> U.S.C. 29 §1056(d)(3)(C), (D).  "[A] QDRO enquiry is relatively discrete, given the specific and objective criteria for a domestic relations order that qualifies as a QDRO . . . requirements that amount to a statutory checklist."  <u>Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan</u>, 555 U.S. 285, 301–02 (2009).[3]  Indeed, a plan "must pay the bearer of a

---

[3] The ERISA regulatory provisions provide the guidelines for assignment or alienation of benefits with respect to a QDRO in 29 U.S.C. § 1056(d)(3):

[QDRO] if it determines that the order is a proper [QDRO], without further inquiry." <u>Trs. of Dirs. Guild of Am.-Producer Pension Benefits Plans v. Tise</u>, 234 F.3d 415, 424 (9th Cir. 2000). Once Ligand had verified that the QDRO met the statutory requirements, Ligand had reason to be concerned about exposure to liability if it did not comply with the QDRO's terms and assign 100% of Plaintiff's total 401(k) account balance to Young as the designated Alternate Payee. (<u>See</u> ECF No. 202-5 at 3.)

On January 8, 2018, Plaintiff continued to insist the QDRO was invalid. Plaintiff explained that the QDRO was trying to divide post-marital assets which was "illegal," and that there was no preceding motion or opportunity to object to the QDRO which the "law requires." (ECF No. 202-7 at 3.) Further, Plaintiff contended the QDRO was a "blanket request for funds," failing to consider what was still owed between Plaintiff and his ex-wife, and thus contrary to what the "law requires" in post-marital proceedings. (<u>Id.</u>) Plaintiff concluded his email stating he was going to hire a lawyer to quash the QDRO. (<u>Id.</u>) Ligand reached out to Latham & Watkins just two days later, on January 10, 2018. (ECF No. 202-9 at 5.)

///

---

(C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies-
(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,
(iii) the number of payments or period to which such order applies, and
(iv) each plan to which such order applies.
(D) A domestic relations order meets the requirements of this subparagraph only if such order-
(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,
(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and
(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

Plaintiff's arguments that the fiduciary exception should apply are unpersuasive. Plaintiff's first two arguments are interdependent, claiming that, (1) the email communications at-issue related to Ligand's administration of Plaintiff's 401(k) Plan, and (2) because Ligand had not yet made a final determination of the validity of the QDRO, Plaintiff was the 401(k) Plan's beneficiary and entitled to disclosure of the communications under the fiduciary exception. (ECF No. 202 at 19, 22.) But these claims ignore the holding in Mett that "where a fiduciary seeks legal advice for her own protection, the core purposes of the attorney-client privilege are seriously implicated and should trump the beneficiaries' general right to inspect documents." Mett, 178 F.3d at 1065.

Plaintiff, however, insists that "it is not until after the final determination that is, after the final administrative appeal that the interests of the Plan fiduciary and the beneficiary diverge for purposes of application of the fiduciary exception." (ECF No. 202 at 20 (citing Stephan v. Unum Life Ins. Co. of Am., 697 F.3d 917, 931 (9th Cir. 2012)).) Plaintiff relies on Stephan to claim that the fiduciary exception should apply here because Ligand had not yet made a final determination of the QDRO's validity.  But Stephan is factually distinguishable from this case because there were no competing interests in Stephan until a final decision was made, adverse to the beneficiary's wishes. In Stephan, the plaintiff appealed his insurance company's determination of his monthly disability benefit amount. 697 F.3d at 922. After the insurance company denied his appeal, the plaintiff sought disclosure of certain communications that occurred between the insurance company's claims analysts and in-house counsel regarding how they interpreted plaintiff's policy to reach the benefit determination. Id. at 932. The court held that the plaintiff was entitled to disclosure of the communications because at that time, the claims analysts' "goal was the determination of [the plaintiff's] disability earnings," and "advice on the amount of benefits [the plaintiff] was owed under the Plan . . . constitute[d] advice on plan administration." Id. at 933. But here, whether Ligand had made a final determination about the QDRO's validity at the time of the

communications is not material because there were competing interests with respect to Ligand's handling of the QDRO.  Thus, Ligand sought legal advice from Latham & Watkins to minimize its exposure in the face of the competing demands—not on behalf of Plaintiff or for purposes of Plaintiff's 401(k) Plan administration.  As previously mentioned, Ryan declares that, "Mr. Berkman has not sought my advice on 401(K) plan administration issues, and I have no expertise on 401(K) plan administrative matters so I would not expect him to seek such advice from me." (ECF No. 202-11 at 2.)

Plaintiff's third argument is that in order to preserve attorney-client privilege, "the Plan's fiduciaries must have requested legal advice to respond to a specific and imminent threat of litigation." (ECF No. 202 at 21 (citing Wit v United Behavioral Health, No. 14-2346, 2016 WL 258604, at *9 (N.D. Cal. Jan. 21, 2016)).)  Plaintiff claims that he had not threatened Ligand with imminent litigation at the time of the communications, and that he sought to work with Ligand in resolving issues he saw with the QDRO rather than against it. (ECF No. 202 at 20-21.)  Plaintiff's claims that he did not have adverse interests to Ligand are not persuasive.  Ligand had an interest in complying with court orders directed at Ligand, and thereby avoiding contempt and other litigation based on any failure to comply.  These interests were not shared by Plaintiff.  Even though Plaintiff's requests were cloaked in the language of collaboration, Plaintiff repeatedly raised potential issues and duties he wanted Ligand to assume. (ECF No. 202-6; ECF No. 202-7.)  He also requested Ligand not comply with the order to permit Plaintiff time to investigate alternatives. (Id.)

///
///
///
///
///
///
///

Ligand reasonably understood that "trouble was in the air." See Mett, 178 F.3d at 1064 (finding indications that "[t]rouble was in the air" were reason enough to seek legal advice for the purpose of potential liability). At the time Ligand sought counsel regarding its liability, it was already subject to a specific court order, and Plaintiff's statements made it clear that two different people, Plaintiff and Young, claimed to be beneficiaries under the 401(k) Plan. Ligand's reasons for seeking legal advice on its own behalf were well-founded given Plaintiff's statements, Plaintiff's hiring outside counsel, and Ligand's history of litigation involving Plaintiff and Young.

## IV.   CONCLUSION

For the reasons stated above, the Court finds the communications at-issue do not fall under the fiduciary exception and are protected by attorney-client privilege. Plaintiff's motion to compel further deposition testimony regarding Ligand's communication with Latham & Watkins is **DENIED**.

**IT IS SO ORDERED**.

Dated:  November 15, 2023

Honorable Michael S. Berg
United States Magistrate Judge