UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN LUNDSTROM,<br><br>                                    Plaintiff,<br><br>v.<br><br>CARLA YOUNG, an individual;<br>LIGAND PHARMACEUTICALS, INC.;<br>LIGAND PHARMACEUTICALs, INC.<br>401(k) PLAN; KOONSFULLER, PC and<br>DOES 1 through 20,<br><br>                                    Defendants. | Case No.: 18-cv-2856-GPC-MSB<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF No. 215, 216–217, 219, 229, 232, 242]** |

Pending before the Court is a Motion for Summary Judgment filed by Defendants Ligand Pharmaceuticals, Inc. ("Ligand") and Ligand Pharmaceuticals, Inc. 401(K) Plan ("the Plan").[1]  ECF No. 216.  A hearing was held on March 29, 2024.  For the reasons stated below, the Motion is **GRANTED**.

---

[1] Also pending is Defendants' Motion to Exclude Expert Testimony.  ECF No. 215.  That motion is **DENIED** as moot.  The Parties' Motions to Seal and Defendants' Request for Judicial Notice are **GRANTED**.  ECF Nos. 217, 219, 229, 232.

1

# BACKGROUND

At the heart of this six-year-old case rests a Qualified Domestic Relations Order ("QDRO"), signed by a state court judge in Texas and served upon Ligand in December of 2017, directing the transfer of Plaintiff's entire 401(k) savings to his ex-wife, Carla Young. ECF No. 120. Ligand notified Plaintiff of the QDRO in January of 2018. *Id.* at 3. Plaintiff immediately sought to invalidate the QDRO in the Texas state appellate system, but those challenges failed. *Id.* at 4, 6. On February 13, 2018, following the Texas Court of Appeals' denial of Plaintiff's Writ of Mandamus, Ligand initiated the distribution of Plaintiff's entire 401(k) account balance to his ex-wife. ECF No. 216-2 at ¶ 27. Plaintiff then brought this federal suit on December 20, 2018, raising twelve claims for relief, including renewed attempts to invalidate the QDRO. He filed his First Amended Complaint ("FAC") on June 4, 2019, and his Second Amended Complaint on May 25, 2022. This Court determined, in its Order on Defendants' Motions to Dismiss, that Plaintiff was collaterally estopped by the state court judgment from challenging the validity of the QDRO, and the Court dismissed each of Plaintiff's claims that attempted to relitigate the issue in federal court. ECF No. 120. Only three claims remain: Plaintiff's first cause of action, which alleges that Ligand violated ERISA by distributing his 401(k) funds prematurely; Plaintiff's fourth cause of action, which alleges that Ligand violated ERISA by failing to provide him with its written procedures for determining the qualified status of the domestic relations order; and Plaintiff's twelfth cause of action, which alleges that Ligand retaliated against him for filing the instant lawsuit. *Id.* Further factual development is reserved for the discussion below.[2]

---

[2] Plaintiff filed a motion to strike Defendant's Responses to Plaintiff's Separate Statement of Undisputed Facts. ECF No. 242. The Court does not rely upon those response and thus **DENIES** the motion as moot.

## STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant bears the initial burden to identify the portions of the record that demonstrate an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When the non-moving party bears the burden of proof, the movant need only demonstrate that there is an absence of evidence to support the claims of the non-moving party. *Celotex*, 477 U.S. at 322.  If the moving party meets this initial burden, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## DISCUSSION

### I. Premature Distribution

Plaintiff's first remaining cause of action (his first cause of action) alleges that the distribution of his 401(k) savings, when he was but fifty-five-years old, was premature. He claims that, under ERISA and the terms of the 401(k) plan, distribution was not permissible until he turned fifty-nine and a half.  ECF No. 228 at 16.

But Plaintiff fails to adequately identify how premature distribution harms him.[3] *See Gatti v. Reliance Standard Life Ins. Co*, 415 F.3d 978, 984 (9th Cir. 2005) (quoting *Jebian v. Hewlett Packard Co.*, 310 F.3d 1173 (9th Cir. 2002)) (cleaned up) ("*Jebian* clarified that a claimant will only be entitled to substantive remedies for procedural violations of ERISA if the claimant can establish that the violation resulted in substantive harm.").  Plaintiff explains that "[a]s a direct and proximate result of Ligand's violation

---

[3] The Court ordered supplemental briefing on the issue at the March 29, 2024, hearing.

of the 401(k) Plan's terms and their breach of fiduciary duty, Plaintiff has been harmed because the 401(k) investment assets are no longer in his account and instead are wrongfully in the possession of Ms. Young." ECF No. 92 at 14.  Even if the investment assets remained in Plaintiff's account, however, he could not access or derive any benefit from them.  The QDRO provides in relevant part:

> This Order awards, assigns and grants to Alternate Payee an amount equal to one-hundred percent (100%) of Participant's total account balance, whether vested or unvested, in the Plan or accumulated under the Plan as of the date the Court signs this order, plus any interest, earnings, investment income, gains, and increase, or losses, attributable thereon from that date until the date of total distribution to Alternate Payee.

ECF No. 216-5 at 103.  Under the QDRO, the 401(k) assets no longer belonged to Plaintiff—they had been assigned entirely to Ms. Young—and thus the Court fails to see how Plaintiff may have been harmed.  *Cf. Borda v. Hardy, Lewis, Pollard Page*, 138 F.3d 1062, 1069 (6th Cir. 1998) ("Because Mr. Borda could not expect to resume his employment with the law firm after the firm's dissolution, it could make no difference to him whether the funds in the suspense account were distributed to the other participants early in 1995 or a year-and-a-half later.  Mr. Borda could not get the funds either way . . . .  It had no adverse effect at all on Mr. Borda's interests, and Mr. Borda was in no position to complain of a premature distribution of funds that were clearly never going to be his.").

In supplemental briefing on the matter, Plaintiff argues that "[h]ad those funds remained segregated in Ligand's Plan, the Court could have remedied Plaintiff by providing equitable relief . . . ." ECF No. 244 at 2.  He explains that the "harm is based on Plaintiff's inability to go after those funds that have been transferred." *Id.*  He provides no citation for either of these contentions.  Plaintiff's argument wholly fails to acknowledge the fact that regardless of the timing of the distribution, Plaintiff had no

right to the underlying funds under the QDRO. He ignores this point entirely, and accordingly, the Court finds his argument unpersuasive.

Even assuming that Plaintiff had demonstrated harm, Defendants correctly argue that Plaintiff's claim would fail on the merits because immediate distribution was consistent with the Plan terms and ERISA. The QDRO required distribution as soon as possible. *See id.* at 104 ("Alternate Payee shall be paid Alternate Payee's benefits as soon as administratively feasible . . . and at the earliest date permitted under the terms of the Plan."). While the Plan terms forbid distribution prior to "retirement or termination" in sections 10.04 and 12.01(a), they contain a carveout for QDRO's. *See* ECF No. 216-5 at 43, 49, 66–67. Section 18.04 reads in relevant part:

> A domestic relations order shall not fail to be deemed a qualified domestic relations order merely because it permits distribution or requires segregation of all or part of a Participant's Account with respect to an alternate payee prior to the Participant's earliest retirement age (as defined in Code Section 414(p)) under the Plan. A distribution to an alternate payee prior to the Participant's attainment of the earliest retirement age is available only if the order provides for distribution at that time and the alternate payee consents to a distribution occurring prior to the Participant's attainment of earliest retirement age.

*Id.* at 67. Thus, the Plan terms allow for early distribution as long as the QDRO provides for distribution at that time. That requirement is satisfied here, where the QDRO provided for distribution "as soon as administratively feasible . . . and at the earliest date permitted under the terms of the plan." *Id.*

Plaintiff responds, first, that the Plan terms require the QDRO "expressly allow" for early distribution. ECF No. 228 at 15. He provides no legal citation for this requirement. As an initial matter, the word "expressly" is not found in the Plan terms. Even if it were, the QDRO expressly provides for distribution "as soon as feasible." Furthermore, in addition to failing to provide a citation for his argument, Plaintiff fails to explain what "expressly allow" would require. Plaintiff's motion does nothing more than regurgitate the language of the QDRO, highlighting and underlining portions of the Plan

terms.  *See* ECF No. 228 at 15–16.  Nowhere, does he articulate why the language of the QDRO is insufficient.  Coupled with Plaintiff's failure to provide legal citation for his argument, Plaintiff's conclusory assertions leave the Court with no concrete argument to address.

Next, Plaintiff argues that *Dickerson v. Dickerson*, 803 F. Supp. 127, 133 (E.D. Tenn. 1992), which was cited in this Court's order on Defendants' Motions to Dismiss, ECF No. 120, forbids the immediate distribution contemplated in the QDRO.  But facts developed through discovery have rendered *Dickerson* distinguishable.  In *Dickerson*, the court was asked whether a divorce decree constituted a valid QDRO where the decree required immediate distribution of the ex-husband's pension benefits—even though the ex-husband was not yet eligible for distribution, and the pension plan's terms did not provide for early distributions.  *Id.* at 131.  The court reasoned that the decree could not be a QDRO because it required the plan "to provide a benefit not otherwise permitted under the pension plan and to disburse pension funds to the alternate payee spouse prior to the participant James Dickerson reaching age 55 which is the earliest retirement age when he is eligible to begin receiving normal retirement benefits under the terms of the SERF plan."  *Id.* at 134.  In other words, the decree didn't qualify as a QDRO because it required immediate distribution in violation of the plan's terms.  The court further concluded that 29 U.S.C. § 1056(d)(3)(E)—which provides certain exceptions by which "[a] domestic relations order shall not be treated as failing to meet the requirements of clause (i) of subparagraph (D)"—could not save the divorce decree, as these exceptions "presume[] that the participant has reached the age where he is eligible to receive retirement benefits under the terms of his pension plan."  *Id.* at 133.

Here, the Texas court order has already been determined to be a QDRO.  ECF No. 120.  That alone distinguishes *Dickerson*, a case in which the court was determining whether the divorce decree constituted a QDRO.  Indeed, Plaintiff's reliance on

*Dickerson* implicitly challenges the validity of the QDRO, an issue they have been explicitly barred from pursuing. *Id.* Furthermore, the plan in *Dickerson* did not allow for early distributions; the Plan, here, does. Accordingly, the instant QDRO does not require the Plan to "provide a benefit not otherwise permitted," and analysis of the exceptions laid out in 29 U.S.C. § 1056(d)(3)(E) is unnecessary. Thus, the Court rejects Plaintiff's reliance on *Dickerson* and **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's first cause of action.

## II. Failure to Provide Written Procedures

Plaintiff's second remaining cause of action (his fourth cause of action) attacks Ligand's failure to provide Plaintiff with a copy of the Plan's written procedures—specifically, the written procedures for determining the qualified status of domestic relations orders. ECF No. 228 at 18. Again, Plaintiff must identify "downstream consequences" of that violation. ECF No. 120 at 32 (quoting *TransUnion*, 141 S. Ct. at 2214). Again, Plaintiff has failed.

ERISA requires that "[e]ach plan shall establish reasonable procedures to determine the qualified status of domestic relations orders." 29 U.S.C. § 1056(d)(G). These procedures must "be in writing" and, upon receipt of any domestic relations order, the plan must promptly provide such procedures to the "participant and each alternate payee" named in the order. *Id.* Defendants concede that their procedures were not written, and, accordingly, that written procedures were not provided to Plaintiff. ECF No. 216-5 at 213. Plaintiff alleges that this failure "depriv[ed] Plaintiff the knowledge of the appropriate avenue to protect his rights against an improperly obtained QDRO."[4] ECF No. 228 at 20. Plaintiff continues further, asserting that "Plaintiff had no idea that

---

[4] Plaintiff's assertion that the QDRO was "improperly obtained" again advances arguments explicitly foreclosed by this Court's prior order. ECF No. 120 at 17–18.

1 the proper venue to challenge the validity of the 401(k) QDRO [wa]s in federal court."
2 *Id.*; *see also* ECF No. 216-5 at 366 ("Exclusive jurisdiction . . . resides with the federal
3 court . . . .").

4       Plaintiff's arguments rely upon several conclusions unsupported by the record, the
5 law, and this Court's prior orders.  To begin with, Plaintiff does not cite to any cases for
6 his contention that the QDRO could only be properly challenged in federal court.  That is
7 because there are none.  *See generally Mack v. Kuckenmeister*, 619 F.3d 1010, 1017 (9th
8 Cir. 2010) (finding state court may "determine whether a DRO is a QDRO"); *In re*
9 *Marriage of Levingston*, 12 Cal.App.4th 1303, 1304 (Cal. Ct. App. 1993) (same);
10 *Langston v. Wilson McShane Corp.*, 776 N.W.2d 684, 685 (Minn. 2009) (same); *Dalton*
11 *v. Dalton*, 551 S.W.3d 126, 142 (Tex. 2018) ("[U]nder ERISA, the proposed order does
12 not qualify as a QDRO.").  More grievous, however, is that Plaintiff's argument runs
13 afoul of this Court's previous holding on collateral estoppel.  He argues, for instance, that
14 he was harmed because he was denied "the opportunity to contest the validity of the
15 401(k) QDRO in a trial court setting with discovery."  ECF No. 228 at 20.  This argument
16 implies that the state court proceedings—where Plaintiff did contest the validity of the
17 QDRO—were deficient, an argument this Court explicitly rejected when it found that the
18 issues had been "fully and fairly litigated in Texas state court."  ECF No. 120 at 20.
19 Plaintiff next asserts, that he challenged the "QDRO through the Texas appellate court
20 system, which denied his petition without any stated reason or analysis whatsoever," and
21 that "[n]ow, Plaintiff has been prejudiced because he cannot challenge [the] validity of
22 the 401(k) QDRO based on collateral estoppel."  *Id.* at 21.  What Plaintiff means by this
23 is unclear; the language appears to operate as an extension of Plaintiff's previous
24 discovery argument.  To that end, the Court finds it unpersuasive for the reasons stated
25 above.  However, to the extent Plaintiff intends to raise an argument in the alternative,
26 that he is injured merely because he litigated the issue in state court as opposed to federal

court, the Court rejects that argument for fresh reasons. Such an argument refuses to acknowledge a "fundamental precept of common-law adjudication, embodied in the . . . doctrine[] of collateral estoppel," *Montana v. United States*, 440 U.S. 147, 153 (1979), and the "full faith and credit" that federal courts must afford state court judgments, *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 467 n.6 (1982).

Additionally, even if this Court were to hold that Plaintiff's decision to challenge the QDRO in state court constitutes an "adverse effect," *TransUnion*, 141 S.Ct. at 2214, Plaintiff has failed to demonstrate that Ligand's procedural violation caused this injury. Plaintiff complains that Ligand failed to provide him with their procedures for determining the status of the QDRO. Ligand's Chief People Officer explained those procedures:

> Q: Okay. Can you describe the process for me?
> A: We will receive a QDRO, and then we notify the individual that the QDRO has been received. Legal counsel will review it to confirm that it is a legitimate and accurate QDRO, and then we move forward with the distribution based on what is listed in the QDRO.

ECF No. 216-5 at 236. Plaintiff fails to explain how notice of these procedures would have altered his choice of forum. Ligand's practice of consulting with outside counsel prior to distribution would not affect Plaintiff's choice of forum. And Plaintiff does not identify any portion of the Chief People Officer's testimony or any other evidence in the record that would suggest that notice of these procedures would have included information about the differences between federal and state court or legal advice suggesting he should file suit in federal court. Instead, he directs this Court to the "Department of Labor's QDRO Booklet," ECF No. 228 at 19, which provides that "[i]t is the view of the Department of Labor that a plan's QDRO procedures should . . . includ[e] . . . [a] description of the process provided under the plan for obtaining a review of the

administrator's determination as to whether an order is a QDRO."[5]  He argues that if Ligand had complied with the Department of Labor's guidance, Ligand's procedures would have included information found in their Summary Plan Description ("SDP") which informs participants that they "may file suit in Federal court."  ECF No. 228 at 20 n.9.

The Department of Labor's view is not binding on this Court, and the Court does not find its expanded interpretation persuasive.  But assuming this Court were to adopt the Department's interpretation, Plaintiff's theory of injury requires two additional assumptions: that the Plan would have included information about obtaining an *external* judicial review of the determination—as opposed to an *internal* company appeal process—and that Plaintiff, upon reading such information, would have chosen to litigate in federal court.[6]  This theory of injury is far too speculative.  *See Carney v. Adams*, 141 S. Ct. 493, 498 (2020).  Thus, for the reasons stated, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's fourth cause of action.

### III.  Retaliation

Plaintiff's final cause of action alleges that Ligand retaliated against him for filing the instant lawsuit by reducing his bonus in 2018, limiting his merit increase in 2019, and terminating his employment in 2021.  Defendants insist that Plaintiff waived this claim pursuant to the release contained in the parties' written 2019 and 2021 settlement agreements.  Plaintiff maintains that the language of the release does not apply to (1)

---

[5] The Court takes sua sponte judicial notice of information publicly available on a government webpage.  Fed. R. Evid. 201(b)(2).

[6] In supplemental briefing, Plaintiff argues that Defendants failed to raise the issue of Article III standing in their initial briefing.  Accordingly, he argues that those arguments must be disregarded.  ECF No. 244 at 3.  But the Court must sua sponte consider issues of standing, and in any event, does not rely upon Defendants' arguments.

claims asserted in the FAC or (2) claims Plaintiff might make in association therewith. Retaliation, he contends, is the latter.

It falls, then, to the Court to determine the scope of the negotiated release. The parties agree that interpretation of the 2019 and 2021 agreements is governed by California law. Under California law, a release is a contract, *Solis v. Kirkwood Resort Co.*, 94 Cal. App. 4th 354, 360 (2001), and its interpretation is governed by the same principles applicable to any other contract, *Matthews v. Atchison, T. & S.F. Ry. Co.*, 54 Cal. App. 2d 549, 557 (1942), the goal being to achieve the parties' intent. Where the contract language is clear and unambiguous, its plain meaning governs. Cal. Civ. Code § 1638. Where the contract language "appears . . . inconsistent," the Court considers the document as a whole, in context, each clause helping to interpret the other. *Mike Rose's Auto Body, Inc. v. Applied Underwriters Captive Risk Assurance Co.*, No. 16-cv-01864-EMC, 2016 WL 5407898 at *5 (N.D. Cal. Sep. 28, 2016). In this manner, the Court may resolve an initial ambiguity by giving effect to every part of a contract and avoiding an interpretation that leaves part of a contract as surplusage. *Rice v. Downs*, 248 Cal. App. 4th 175, 186 (2016), *as modified on denial of reh'g* (June 23, 2016), *as modified* (June 28, 2016).

If the ambiguity remains unresolved, the Court "may consider extrinsic evidence to determine the parties' intent at the time the agreement was executed, including 'earlier negotiations, later conduct, related agreements, and industrywide custom.'" *Trustees of Operating Engineers Pension Trust v. Smith-Emery Co.*, Inc., 906 F. Supp. 2d 1043, 1054 (C.D. Cal. 2012) (quoting *Pierce County Hotel Employees & Restaurant Employees Health Trust v. Elks Lodge,* 827 F.2d 1324, 1327 (9th Cir. 1987)). Where, after all of the above, ambiguity persists, "and contrary inferences as to intent are possible, there exists an issue of material fact for which summary judgment is ordinarily

inappropriate." *Arizona Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund v. Conquer Cartage Co.,* 753 F.2d 1512, 1518 (9th Cir. 1985).

At the summary judgment stage, the Court must determine whether the contract may be interpreted as a matter of law. Before proceeding with its analysis, the Court furnishes further relevant facts.

Following the dispute over the validity of the QDRO and Ligand's distribution of Plaintiff's retirement funds, Plaintiff worried that he might be "wrongfully terminated." ECF No. 216-5 at 384. In two notes, delivered to Ligand's president and general counsel prior to the filing of the FAC, Plaintiff detailed those worries. *Id.* at 369. The first note, sent February 11, 2019, described a conversation Plaintiff overheard where the Plan administrator asked the company's president to terminate Plaintiff. *Id.* at 375–376. Plaintiff wrote that such behavior "may be seen as retaliatory" and "that it obviously would be necessary to take precautions against wrongful termination." *Id.* In the second note, sent April 3, 2019, Plaintiff reported that "outside counsel, Jake Ryan, ha[d] hinted for Ligand to terminate [Plaintiff]." *Id.* at 378.

Two months later, on June 19, 2019, Plaintiff filed the FAC, including nine claims related to Ligand's processing of the QDRO. ECF No. 42. The FAC did not plead a retaliation claim. Nor did it allege Plaintiff's salary-related reductions. But those concerns remained top-of-mind for Plaintiff, and so he retained John Vanderpool, an attorney that he believed "knew how to deal with retaliatory and wrongful termination matters." ECF No. 216-5 at 384–85.

On July 29, 2019, following extensive negotiations, Plaintiff and Ligand entered into the 2019 Confidential Settlement Agreement ("2019 CSA"), to resolve the "dispute [that] ha[d] arisen between the Parties related to [Plaintiff]'s employment." ECF No. 218-5 at 2. The 2019 CSA represents that "the Parties jointly participated in the drafting" and that the agreement was "freely and voluntarily entered into, and that each of the

Parties has had an opportunity to consult with counsel."[7] ECF No. 218-5 at 9; ECF No. 216-2 at ¶ 51. In accordance with the 2019 CSA, Plaintiff would continue working as a "business development executive" until December 31, 2022, at which point his employment would terminate. ECF No. 218-5 at 2–3. If Plaintiff were terminated without cause prior to that point, Ligand agreed to continue to pay Plaintiff his base salary, provide current-level benefits, and allow for full vesting of options through the time remaining. *Id.* at 7–8. In exchange, Plaintiff signed a "General Release," which "release[d] and discharge[d] Ligand and its Related Parties from any and all liabilities, claims, wages, agreements, obligations, demands and causes of action . . . arising out of or in any way connected with [Plaintiff]'s employment relationship with Ligand . . . ." *Id.* at 4. Section 8 of the 2019 CSA ("2019 Carveout") provided, however, that:

> Lundstrom is currently litigating *Lundstrom v. Young et al.* (Case No. 3:18-cv-02856) in the United States District Court for the Southern District of California (the "Ongoing Litigation"). Lundstrom has asserted claims against Ligand and the Ligand Pharmaceuticals Incorporated 401(k) Plan in the Ongoing Litigation (the "Ongoing Litigation Claims"). The releases and covenants in Settlement Agreement shall not apply to the Ongoing Litigation Claims that Lundstrom has made or may make in association therewith.

*Id.* In 2021, following a separate licensing dispute, Ligand sought to accelerate Plaintiff's termination date, and the two parties entered into the 2021 Confidential Settlement Agreement ("2021 CSA"). The parties agreed that Plaintiff's employment would end on July 1, 2021, and that he would "never seek employment at Ligand or any of its affiliates" again. ECF No. 216-5 at 392. But until December 31, 2022, he would continue to be paid his monthly salary, his existing stock options would continue to vest,

---

[7] The 2021 Confidential Settlement agreement contains similar representations. Plaintiff's opposition asserts that the agreements were entirely prepared by Ligand, ECF No. 228 at 24, an assertion that Plaintiff's counsel repeated at oral argument. Upon reviewing the document, however, Plaintiff's counsel conceded that he was mistaken.

and Ligand would continue to provide his health insurance. *Id*. In exchange, Plaintiff agreed to a second release, far more detailed than the general release contained in the 2019 CSA. The 2021 CSA release provided that in exchange for the termination benefits set forth in the agreement, and except for those obligations created by or arising out of the "Ongoing Litigation":

> [Plaintiff] agrees to release and forever discharge Ligand . . . from any and all claims . . . based on any events or circumstances arising or occurring on or prior to the date hereof, arising directly or indirectly out of, relating to, or in any other way involving in any manner whatsoever [Plaintiff]'s employment by or service to Ligand and its Related Parties or the termination thereof, including any and all claims arising under federal, state, or local laws relating to employment, including without limitation claims of wrongful discharge . . . and claims of any kind that may be brought in any court or administrative agency including, without limitation, claims under . . . the Employee Retirement Income Security Act . . . .

ECF No. 218-6 at 6–7. The 2021 CSA explicitly released claims of wrongful discharge and claims brought under ERISA arising from Plaintiff's termination. Section 8 of the 2021 CSA ("2021 Carveout") largely mirrored the 2019 Carveout:

> Ongoing Litigation. Lundstrom is currently litigating *Lundstrom v. Young et al.* (No. 20-55002) in the United States District Court for the Southern District of California (Case No. 3:18-cv-02856), and a state court action entitled *Lundstrom v. Young et al.* (Case No. 37-2020-00039495-CU-NP-CTL) in the Superior Court of the State of California, County of San Diego (collectively referred to herein as the "Ongoing Litigation"). Lundstrom has asserted claims against Ligand and the Ligand Pharmaceuticals Incorporated 401(k) Plan, as well as Carla Young, in the Ongoing Litigation (the "Ongoing Litigation Claims"). *The releases and covenants in this Agreement shall not apply to the Ongoing Litigation Claims that Lundstrom has made or may make in association therewith*, nor shall they apply to any defenses or counterclaims that Ligand may assert in connection with the Ongoing Litigation.

*Id*. at 9. The question before the Court is whether Plaintiff's retaliation claim, which directly tracks the language of 2021 CSA release, was nevertheless preserved by the 2021 Carveout as a claim "ma[d]e in association" with "Ongoing Litigation Claims."

Plaintiff urges the Court to adopt the plain language of the contract, reasoning that he was retaliated against for filing the "Ongoing Litigation Claims," and thus his retaliation claim is necessarily "made in association" with those claims. Defendants respond that as a matter of plain meaning, Plaintiff's retaliation claim is not "made in association" with an "Ongoing Litigation Claim" because "[i]t is an entirely new cause of action based on previously unpleaded operative facts." ECF No. 216-1 at 22. At the time the 2021 CSA was signed, "the operative pleading was the FAC, and all of [Plaintiff's] claims against Ligand in the FAC related to its administration of the two Texas domestic relations orders then at issue. There was no claim (or even allegation) that Ligand had retaliated against Lundstrom in violation of ERISA." *Id.*

Viewed in isolation, the 2021 Carveout is arguably susceptible to both interpretations. Defendants correctly observe that the FAC contained no allegations or claims relating to wrongful discharge or retaliation. In all likelihood, Plaintiff could not have raised his retaliation claim in the FAC without alleging additional facts. In this sense, Plaintiff's retaliation claim is not one he "ha[d] made" or "m[ight] make in association therewith". But that does not decide the matter. Because the language of the 2021 Carveout, alone, does not require such a strict and narrow interpretation. As Plaintiff emphasizes, "nothing in the 'may make in association therewith' language . . . expressly limits Plaintiff from asserting new claims based on a different set of facts than those pled in the FAC." ECF No. 228 at 23. Read more charitably, the 2021 Carveout could preserve Plaintiff's retaliation claim: the claim was made in association with the "Ongoing Litigation Claims" because the claim would not exist but for the initiation of

the "Ongoing Litigation." Accordingly, an analysis constrained to the language of the 2021 Carveout results in an ambiguity.[8]

However, Plaintiff's interpretation sours in the framing of the entire document. The 2021 CSA release, though sprawling in its drafting, is specific in its subject matter. Plaintiff "releases . . . claims . . . relating to . . . [his] employment . . . or the termination thereof." ECF No. 218-6 at 6–7. Specifically enumerated are claims of "wrongful discharge" and claims related to Plaintiff's employment and termination brought under "the Employee Retirement Income Security Act." *Id*. Plaintiff's retaliation claim, essentially a claim for wrongful discharge brought under the Employee Retirement Income Security Act, tracks the release language perfectly. To adopt Plaintiff's interpretation of the 2021 Carveout, and to allow his retaliation claim to survive, would be to render these portions of the release language ineffectual. That is not what California law teaches.

Only by limiting the reach of the 2021 Carveout may the Court give effect to every part of the contract. The Court construes the 2021 Carveout to provide safe harbor only to claims attacking Ligand's processing of the QDRO that could have been pleaded upon the facts asserted in the FAC. Under this construction, both the 2021 Carveout and the release language retain their effect. Plaintiff complains that such an interpretation robs the carveout clause of any meaning, but his past actions belie such an argument. Plaintiff's eleventh cause of action in his Second Amended Complaint takes full advantage of this Court's construction, alleging a new state law claim for negligence

---

[8] Because the Court finds that the agreement is subject to some initial ambiguity, Plaintiff's argument in supplemental briefing—that Defendants should be estopped from arguing that the contract is unambiguous—is moot. ECF No. 242 at 6.

arising out of Ligand's processing of the QDRO.  SAC at 29–30.  The 2021 Carveout preserved Plaintiff's right to pursue his negligence claim but not his retaliation.[9]

To the extent any ambiguity persists, the extrinsic evidence confirms this Court's reading.  The CSAs were negotiated following Plaintiff's notes regarding retaliation and wrongful discharge.  The 2021 CSA differed from the 2019 CSA, explicitly including a release for claims relating to Plaintiff's termination, including claims of wrongful discharge and claims under the Employee Retirement Income Security Act.  The parties' decision to include such additions cannot be ignored, much less rendered surplusage by Plaintiff's overly broad reading of the 2021 Carveout.  Indeed, to adopt Plaintiff's reading in light of the background concerns about retaliation and wrongful discharge would create an absurd result: "his voluntary signing of the 2021 CSA, while represented by counsel, w[ould be] itself an act of retaliation that was not released by the 2021 CSA." *See* ECF No. 216-1 at 23; *see also Cnty. of Humboldt v. McKee*, 165 Cal. App. 4th 1476, 1498, *as modified on denial of reh'g* (Sept. 10, 2008) (avoiding interpretations that create absurd result).  Accordingly, this Court concludes that the 2021 CSA waives Plaintiff's right to pursue his retaliation claim.

Plaintiff's final argument is that there exists a material dispute as to whether Plaintiff's waiver is enforceable.  "Courts in this district have adopted the First Circuit's

---

[9] Plaintiff argues that under *Singley v. Ill. & Midland R.R.*, this Court "should interpret the carveout to allow plaintiff to bring his ERISA retaliation claim.  24 F. Supp. 2d 900, 901 (C.D. Ill. 1998).  But in *Singley*, the penultimate sentence of the release clause explicitly excepted ERISA claims.  *Id.* ("This Agreement and/or Release does not restrict any rights or privileges the Employee is entitled to by virtue of the Company's 401(k) plan and the Employee Retirement Income Security Act.").  Relying on that "penultimate sentence," the court in *Singley* allowed plaintiff's retaliation claim.  *Id.* at 903.  Here, the CSA's release clause explicitly includes Plaintiff's ERISA claims.  See ECF No. 216-2 at ¶ 48.  *Singley* is thus inapposite.

*Morais* test for determining whether a waiver of ERISA claims is knowing and voluntary. Under *Morais*, the court must examine the totality of the circumstances, including but not limited to the following six factors: '(1) plaintiff's education and business sophistication; (2) the respective roles of employer and employee in determining the provisions of the waiver; (3) the clarity of the agreement; (4) the time plaintiff had to study the agreement; (5) whether plaintiff had independent advice, such as that of counsel; and (6) the consideration for the waiver.'" *Colaco v. Asic Advantage Simplified Employee Pension Plan*, No. 5:13-cv-00972-PSG, at *7 (N.D. Cal. Sep. 24, 2015) (quoting *Morais v. Central Beverage Corp. Union Employees' Supplemental Retirement Plan*, 167 F.3d 709, 713 (1st Cir. 1999)). Each factor favors Defendants. (1) Plaintiff is sophisticated; he has a "masters in sciences" and the "equivalent of an M.B.A." from Denmark. ECF No. 216-5 at 352. (2) The construction of the CSA involved input from both parties' counsel. *Id.* at 396. (3) As discussed above, the Court finds the CSA to be clear. (4) Plaintiff had time to review several drafts of the agreement between May 21, 2021, and June 21, 2021, (5) with the "counsel of [his] choice." *Id.* (6) And in exchange for signing the CSA, Plaintiff continued to receive his salary for an additional year and four months following his termination. Plaintiff's motion only challenges the third factor, arguing that the CSA "lacks clarity and is ambiguous to the point that it creates a genuine issue of material fact as to whether Plaintiff's acceptance of the terms of the 2021 CSA constituted a voluntary, deliberate, and informed waiver of his right to pursue his ERISA retaliation claim against Ligand." This is an argument the Court has already rejected. Plaintiff does not challenge the voluntary nature of the waiver on any other grounds, and summarily concludes that there "exists a material disputed fact as to whether Plaintiff voluntarily entered into the 2021 CSA and released his ERISA retaliation claim." Such a conclusory statement, without more, is not sufficient to stave off summary judgment. *See California v. Trump*, 963 F.3d 926, 936 (9th Cir. 2020) (quoting *Clapper v. Amensty Int'l USA*, 568 U.S. 398,

412 (2013)) ("At summary judgment, a plaintiff cannot rest on mere allegations, but 'must set forth by affidavit or other evidence specific facts.'").

Because the Court concludes that the 2021 Carveout does not apply to Plaintiff's retaliation claim, and because Plaintiff has failed to direct the court to specific facts demonstrating a material dispute, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's twelfth cause of action.

## CONCLUSION

The Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's First, Fourth, and Twelfth causes of action. The Clerk shall enter judgment accordingly and close the case. Defendant's Motion to Exclude is **DENIED** as moot. ECF No. 215.

**IT IS SO ORDERED.**

Dated: May 9, 2024

Hon. Gonzalo P. Curiel
United States District Judge